IN THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | |
|---|---|
| RONALD NESMITH, TERRY CROSBY, and RICHARD MAYE, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STAR FREIGHT LLC,<br><br>Defendant. | CLASS ACTION COMPLAINT<br><br><br>JURY DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Ronald Nesmith, Terry Crosby, and Richard Maye bring this case individually and on behalf of others similarly situated against Defendant Star Freight LLC ("Star Freight") for breach of contract and violations of the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2). Plaintiffs bring their claims as a putative class action.

## NATURE OF THE CASE

1. Defendant engaged in a widespread scheme to violate its Lease Agreements with owner-operators/lessors in order to steal part of their compensation.

2. Defendant is a federally licensed motor carrier that enters into contracts ("Lease Agreements") with owner-operators to use their trucks, with or without a driver, to transport goods under their motor carrier license. Plaintiffs and other drivers worked for Defendant as owner-operators.

**Parties**

3. Plaintiff Richard Maye, an Alabama resident, is an interstate truck driver with more than 35 years of experience in the transportation industry. He has a CDL Class A license and worked for Defendant as an owner-operator from approximately 2018 to 2020. During all times that Maye worked for Defendant, he was not an agent of Defendant for the purposes of the TILA.

4. Plaintiff Ronald Nesmith, an Alabama resident, is an interstate truck driver with 32 years of experience in the transportation industry. He has a CDL Class A license and worked for Defendant as an owner-operator from approximately 2017 to 2019. During all times that Nesmith worked for Defendant, he was not an agent of Defendant for the purposes of the TILA.

5. Plaintiff Terry Crosby, a Louisiana resident, is an interstate truck driver with eight years of experience in the transportation industry. He has a CDL Class A license and worked for Defendant as an owner-operator in or about 2018-2020. During all times that Crosby worked for Defendant, he was not an agent of Defendant for the purposes of the TILA.

6. Defendant Star Freight LLC is an Indiana business corporation with principal place of business in Valparaiso, Indiana. Star Freight is a federally regulated motor carrier providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

7. Star Freight employs or contracts with drivers to transport its customers' freight in interstate commerce. As part of its business, Star Freight leases equipment from other related entities or owner-operators.

8. Star Freight is registered under MC-654818, US DOT # 1800502. According to the SAFER – FMCSA management information systems, Star Freight reported that it operated

78 power units (semi-trucks) and 78 drivers. Further, Star Freight reported ran approximately 7,509,522 miles so far in 2022.

## Jurisdiction and Venue

9. The Court has subject matter jurisdiction over this action pursuant to the TILA, 49 U.S.C. § 14704 & 28 U.S.C. § 1331.

10. Venue is proper in this jurisdiction under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Indiana.

## TILA Legal Standards

11. TILA and its implementing regulations govern the terms and conditions under which owner-operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *See* 49 U.S.C. § 14102(a); 49 C.F.R. § 376.12. TILA regulations require the motor carrier's equipment leases to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). The regulations also require that those leases disclose the details of any escrow withholdings and charge back items. *Id*. at § 376.12 (h), (k). When the lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the carrier will provide the lessor a copy of the rated freight bill, or any other documentation used for a shipment containing the same information. *Id*. at 376.12(g). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

**Common Facts**

12. Plaintiffs and other drivers worked for Defendant as owner-operators for purposes of the TILA regulations. 49 C.F.R. § 376.2. They transported goods for Defendant by driving the trucks they leased from Defendant's affiliate leasing company.

13. Plaintiffs signed Independent Contractor Agreement (hereinafter "Lease Agreement") with Defendant to "lease" the trucks to Defendant for the purpose of transporting goods. This was the lease required by 49 C.F.R. § 376.11.

14. The Lease Agreements constitute "leases" under the TILA rules and are subject to their regulations. 49 C.F.R. § 376.2(e).

15. Under the Lease Agreements, Star Freight, as the authorized carrier, holds the federal motor carrier operating authority needed to provide services for the transport of non-exempt goods in interstate commerce. Plaintiffs leased their equipment (with or without drivers) to Star Freight for the purpose of transporting goods through interstate commerce under Star Freight's licenses and permits.

16. The Lease Agreements provided that Defendant would pay Plaintiffs a percentage of the Adjusted Gross Revenue ("AGR") of each load hauled with their equipment. The AGR was the gross receipt (total price) of the load, less specific deductions that are listed in the Lease Agreements. The percentage depended on the type of trailer used to haul the load, as specified in the Lease Agreement. Defendants agreed to pay 72% of AGR for Dry Van (non-temperature-controlled trailers) or Power Only (trailer provided by the shipper), 71% of AGR for reefer (temperature-controlled trailers), and 74% of AGR for intermodal containers (containers that can move between trucks, trains, and cargo ships).

17. Defendant frequently refused to provide Plaintiffs with copies of the original

brokers' load confirmation sheets. Instead, Defendant communicated the price of the load to Plaintiffs via text message, over the phone, or through Omnitracs (Defendant's fleet management software). For instance, Nesmith requested rate confirmations on numerous occasions, and Star Freight refused to provide them.

18. Defendant lied and under-reported the load rate (or price) of Plaintiffs' loads to Plaintiffs, and then paid Plaintiffs their allotted percentage of the lower, underreported amount, in violation of their Lease Agreements with Plaintiffs.

19. Defendant directly pocketed the portion of gross receipts they concealed from each driver and paid drivers' their promised portion of on the lower, underreported amount.

20. On at least three occasions, Plaintiff Nesmith directly contacted the third-party broker responsible for booking a load he hauled for Star Freight. On each occasion, the broker told Nesmith that the shipper was paying Star Freight a higher price for the load than Star Freight had reported to Nesmith.

21. In or about 2017, 2018, or 2019, while talking to another Star Freight driver at a truck stop in Columbus, Ohio, Nesmith learned that Star Freight had reported different prices to him and the other driver for identical loads they transported on the same day.

22. Star Freight dispatch regularly told Crosby the exact same price for reefer loads going on different days. Crosby knew from his experience driving reefer trucks that the actual price of reefer loads always varies day-by-day, so it was highly unlikely that Star Freight was quoting him the actual price of the reefer loads.

23. Maye observed that on the rare occasions he did receive the original brokers' rate confirmation sheet for a particular load, the confirmation sheets reported a higher price for the load than the price Star Freight dispatch reported to Maye, and a higher price than the price listed

on Maye's settlement sheet (pay document).

24. Defendant violated the TILA rules by not adhering to the terms of its lease agreement. 49 C.F.R. § 376.12 (intro paragraph).

25. During the past five years alone, Defendant has collectively contracted with more than 100 lessors/owner-operators to provide transportation service for its clients.

26. On information and belief, Defendant executed substantively identical Lease Agreements with more than 100 drivers.

27. During the weeks that Plaintiffs worked for the company, Defendant deducted significant amounts from Plaintiffs' wages or final compensation.

28. Defendant deducted money from Plaintiffs' compensation for a so-called escrow account.

29. Defendant did not pay interest on Plaintiffs' escrow accounts or return the escrow to Plaintiffs when they terminated their employment with Defendant.

**Class Allegations**

30. Plaintiffs bring this action on behalf of themselves and the following classes of similarly situated individuals or entities, defined as:

> All individuals or entities that signed Lease Agreements with Defendant from October 4, 2012 to the present and were paid based on a percentage of the load rate.

31. The Class defined above satisfies the requirements of Rules 23(a) and 23(g).

   a. **Numerosity.** The Class is so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court. Since 2012, Defendant has executed Lease Agreements with more than 100 owner-operator drivers.

b. **Commonality.** Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the Class include, among others, the following:

   i. Whether Defendant breached the terms of its Lease Agreements with owner-operator drivers by paying them less than the promised percentage of gross receipts on each load;

   ii. Whether Defendant intentionally deceived owner-operator drivers by lying to them about the gross receipts for loads they hauled and on which their compensation was based;

   iii. Whether Defendant paid interest on the escrow accounts they deducted from owner-operators' settlements;

   iv. Whether Defendant refused to return drivers' escrow accounts without justification.

c. **Typicality**. Plaintiffs' claims are typical of the Class's claims because Plaintiffs and all Class members were injured through Defendant's uniform misconduct. The claims of Plaintiffs and the Class arise from the same operative facts and are based upon the same legal theories. There are no defenses unique to Plaintiffs.

d. **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests the Class because (i) Plaintiffs have retained competent and experienced counsel that have the time, experience, and resources to litigate this case; (ii) Plaintiffs are members of the Class, their claims are typical of the Class, and they have suffered substantially similar injuries to those suffered by the rest of the Class; (iii) Plaintiffs' interest in obtaining monetary relief for the Class are consistent with and not antagonistic to the interests of the Class.

32. The proposed Class satisfy the requirements of Fed. R. Civ. P. 23(b)(3).

    a. **Predominance**. Common questions predominate over any individual questions because the important and prevalent issues in this case concern Defendant's conduct and its effects, which are common to the Class. Individual issues are minor and may be nothing more than damages calculations pursuant to a formula.

    b. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiffs and the Class, while collectively substantial, are relatively small per Class member compared to the burden and expense required to individually litigate their claims. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one class-wide proceeding.

<u>**Count I - Breach of Contract**</u>

33. Plaintiffs incorporate all prior allegations as if fully stated herein.

34. Defendant contracted with Plaintiffs and the Class members through substantively identical Lease Agreements.

35. The Lease Agreements state that the owner-operators were to receive a specific percentage of the AGR, or the actual freight rate that brokers or shippers paid Defendant for the drivers' line haul transportation services, less specific deductions listed in the Lease Agreements.

36. Plaintiffs and the Class members substantially performed all their obligations under their contracts with the Defendant.

37. Defendant breached the contracts with Plaintiffs and the Class members by not paying them based on the real rate that brokers or shippers paid to Defendant.

### Count II - Truth in Leasing Act

38. Plaintiffs incorporate all prior allegations as if fully stated herein.

39. Defendant is a motor carrier licensed with the U.S. Department of Transportation. Plaintiffs worked for Defendant as owner-operators for purposes of TILA.

40. Pursuant to the TILA regulations, Defendant signed Lease Agreements with Plaintiffs and the Class members.

41. Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

42. Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph). The TILA also requires that leases disclose all "chargebacks," or deductions from compensation. *Id.* at § 376.12(h). Finally, the regulations require the carrier to pay interest on the amounts that it holds in escrow. *Id.* § 376.12(k)(5).

43. Defendant never paid interest on the amounts it deducted in escrow from Plaintiffs' and the other owner-operator drivers' pay.

44. In the Lease Agreements, Defendant agreed to pay Plaintiffs and the other owner-operator drivers a certain percentage of the AGR for each load they hauled for Defendant.

45. Defendant did not adhere to the terms of the Lease Agreements because it paid drivers less than the percentage of the AGR promised in the Lease Agreements.

46. Under 49 U.S.C. §14704(a)(2), Defendant is liable to Plaintiffs and the Class for the damages that they suffered on account of Defendant's regulatory violations.

## Prayer for Relief

Plaintiffs, individually and on behalf of the Class, respectfully pray for the following relief:

a. An order certifying the Class as defined above, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class Counsel;

b. An award of all economic, monetary, actual, consequential, and compensatory, damages available under the law;

c. An award of restitution and disgorgement;

d. An award of all equitable relief requested herein;

e. An award of reasonable litigation expenses and attorneys' fees;

f. An award of pre- and post-judgment interest, to the extent allowable; and

g. Other further relief that the Court deems just and reasonable.

## Jury Demand

Plaintiff demands trial by jury on all issues as to which a jury trial is available.

Date: October 4, 2022

Respectfully submitted,

/s/ Christopher J. Wilmes
One of the Attorneys for the Plaintiff

Christopher J. Wilmes
cwilmes@hsplegal.com
Emily R. Brown
ebrown@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100